**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

EB RUMBLE FRANCHISING, LLC,

Plaintiff,

v. Case No. 8:26-cv-2383-KKM-LSG

THREE SOUTH TAMPA LLC, et al.,

Defendants.

---

# ORDER

This action arose following the end of a business relationship between Plaintiff EB Rumble Franchising, LLC, and Three South Tampa LLC, One Hillsborough LLC, and Henry Taylor (the Franchisee Defendants), who contracted to permit the Franchisee Defendants to operate two Rumble fitness studios in Tampa, Florida. Rumble alleges that the Franchisee Defendants prematurely abandoned the franchises in order to operate a competing business, Temper Studios LLC, solicited former Rumble customers, and continue to use Rumble's trademarks without license, all in concert with the Franchisee Defendants' former operating partner, Haley Hunt. *See generally* Compl. (Doc. 1). Rumble brings claims that the Franchisee Defendants breached the franchise agreements, Hunt and Temper tortiously interfered with the franchise agreements, and all the defendants infringed Rumble's

trademarks, unfairly competed with Rumble, and conspired to evade the franchise agreements' restrictions and obligations and Rumble's trademark rights. Compl. ¶¶ 75–115.

Rumble moves for a preliminary injunction. Mot. for Prelim. Inj. (PI Mot.) (Doc. 4). Along with the papers, the parties offered testimony at an evidentiary hearing in support of their positions. Because Rumble has shown that it is likely to prevail on its breach-of-contract, trademark-infringement, unfair-competition, and tortious-interference claims but not its civil-conspiracy claim; that it will be irreparably harmed in the absence of a preliminary injunction; and that the balance of the hardships and the public interest favors a preliminary injunction, the motion is granted in part.

## I. BACKGROUND

### A. Rumble's Marks and Franchising System

Rumble owns six trademarks that are valid and registered with the U.S. Patent and Trademark Office (USPTO). *See* Ex. A (Doc. 53-1). These marks include "RUMBLE," "RUMBLE BOXING," "RMBL," and three graphic designs. *Id.*

Rumble operates a franchising system for the "establishment of group fitness studios that provide a unique boxing-inspired, high-energy workout experience with the strategic fusion of boxing, HIIT [high intensity interval training], power, and strength training using" Rumble's marks. Ex. T (Higham

Decl.) (Doc. 53-20) ¶ 5. Under its franchising system, Rumble "grants franchisees licenses to enjoy and use the Rumble® tradename, trademarks, service marks, commercial symbols, and related marks, and the goodwill associated with such marks [ ], to develop, own, and operate their Rumble® fitness studios." *Id.* Rumble has about seventy active franchises, including five in Florida. *Id.*

### B. The Franchise Agreements

Rumble and the Franchisee Defendants entered into two franchise agreements.[1] First, Rumble and Taylor entered into the Downtown Franchise Agreement on November 9, 2021. Compl. ¶ 24; Ex. B (Downtown Franchise Agreement) (Doc. 5-2). The Downtown Franchise Agreement granted Taylor the right to operate a Rumble fitness studio for ten years within an Atlanta, Georgia zip code. *See* Downtown Franchise Agreement ¶¶ 1.3, 3.1. Taylor later relocated this franchise to downtown Tampa, Florida, and opened a studio at 119 West Tyler Street Suite B-1. Higham Decl. ¶ 9. Taylor assigned this contract to his limited liability company, One Hillsborough, on October 11, 2023, *see* Downtown Franchise Agreement at 57–60, and personally

[1] Rumble is the successor-in-interest with respect to the franchise agreements, which were formed by its predecessors, Rumble Franchise SPV, LLC, and Rumble Franchise, LLC. Compl. ¶ 18.

guaranteed it, agreeing to be liable for One Hillsborough's payment and performance, *id.* at 53–54.

Second, Rumble and Taylor's other limited liability company, Three South Tampa, entered into the South Tampa Franchise Agreement on July 25, 2024. Compl. ¶ 25; Ex. C (South Tampa Franchise Agreement) (Doc. 5-3). The South Tampa Franchise Agreement granted Three South Tampa the right to operate a Rumble fitness studio for ten years at 209 South Dale Mabry Highway, Tampa, Florida. South Tampa Franchise Agreement ¶ 3.1; *id.* at 48. Taylor also personally guaranteed this agreement. *Id.* at 51–52.

The two franchise agreements have substantially similar terms. They each recognize that the Rumble Marks "are the sole and exclusive property of [Rumble]" and its affiliates and grant the Franchisee Defendants a nonexclusive right to use them under the franchise agreements' terms. *See* Franchise Agreements (Docs. 5-2, 5-3) ¶ 4.1. They further acknowledge that the franchisee may use Rumble marks "only in the manner and form authorized by" Rumble and not in the conduct of any other business. *Id.*

The franchise agreements also have confidentiality obligations. *Id.* ¶ 12. Under those provisions, the Franchisee Defendants agreed that "all information relating to the [Rumble] System and to the development and operation of the [Rumble] Studio, including . . . the [Rumble] Manual, Franchisor's training program, members and supplier lists, or other

information or know-how distinctive to a Rumble Franchise" is confidential information that is "considered to be proprietary and trade secrets of [Rumble]." *Id.* ¶ 12.1.A. The Franchisee Defendants also agreed "not to copy, duplicate, record or otherwise reproduce any Confidential Information . . . nor use them in any other business or in any manner not specifically authorized or approved in writing by [Rumble]." *Id.*

Further, the franchise agreements have noncompete and nonsolicitation covenants. *Id.* ¶¶ 13.1, 13.2. These covenants define a competing business as "any fitness or exercise business, any fitness or exercise marketing or consulting business, any business offering products of a similar nature to those of the [Rumble] Studio, or [ ] any business or entity which franchises, licenses or otherwise grants to others the right to operate such aforementioned businesses" and a restricted party as the "Franchisee, its principals, owners, or guarantors," or their immediate family. *Id.* ¶ 13.1.A.

The noncompete covenant provides that a restricted party may not "have any interest in or involvement" with a competing business during the term of the agreement. *Id.* It also provides that, for two years after the termination of the agreement, a restricted party may not "own, maintain, engage in, be employed as an officer, director, or principal of, lend money to, extend credit to, lease/sublease space to, or have any interest in or involvement with, any other Competing Business" at the former studio location or within ten miles of

the studio or any other Rumble studio that "is open, under lease[,] or otherwise under development as of the date" that the agreement is terminated. *Id.* ¶ 13.1.B.

The nonsolicitation covenant provides that a restricted party may not, for two years after the termination of the franchise agreement, "solicit business from customers of Franchisee's former Studio," "contact any of [Rumble]'s suppliers or vendors for any competitive business purpose," or, "solicit any of Franchisor's other employees, or the employees of Franchisor's affiliates or any other [Rumble] franchisee, to discontinue employment." *Id.* ¶ 13.2.

The franchise agreements impose other posttermination obligations. *Id.* ¶ 15. The posttermination articles provide that "Rumble may terminate [the franchise agreements] and all rights granted [t]hereunder, without affording [the Franchisee Defendants] any opportunity to cure the default, effective immediately upon receipt of notice by [the Franchisee Defendants], and such termination shall be for good cause where . . . [the Franchisee Defendants] voluntarily or otherwise abandon[] the Studio[s]." *Id.* ¶ 15.1.A(4). Abandonment includes any of the Franchisee Defendants' "failure to actively operate the Studio for more than two (2) business days without [Rumble]'s prior written consent" or "any other conduct on the part of [the Franchisee Defendants] or [their] principals that [Rumble] determines indicates a desire

or intent to discontinue operating the studio in accordance with [the franchise agreements] or the [Rumble] Manual." *Id.*

The posttermination obligations further provide that, immediately upon termination, "[a]ll rights, privileges and licenses granted by [Rumble] to [the Franchisee Defendants] shall immediately cease and . . . revert to [Rumble]," and that the Franchisee Defendants must comply with the noncompete and nonsolicitation covenants. *Id.* ¶¶ 15.3.A, 15.3.G. They also require the Franchisee Defendants to, at their own expense, "remove all signs, obliterate or remove all letterheads, labels[,] or any other item or form of identification that would in any way link or associate [the Franchisee Defendants], its goods and/or services with [Rumble]," "cease to use, in any manner, the [Rumble] Marks, System[,] and any other copyrighted information or materials or any confidential information [the Franchisee Defendants] obtained as a result of the franchise," "terminate all advertising and promotional efforts and any other act that would in any way indicate that [the Franchisee Defendants] [are] or [were] ever authorized Rumble franchisee[s]," and "cancel any assumed name . . . or equivalent registration that contains any Proprietary Mark." *Id.* ¶¶ 15.3.B–D. The Franchisee Defendants also agreed "not to use any reproduction, counterfeit, copy, or colorable imitation of [Rumble's] Marks that is likely to cause confusion, mistake or deception, or that is likely to dilute [Rumble's] rights in and to the marks" and "not to use any trade dress or

designation of origin or description or representation that falsely suggests or represents an association or connection with [Rumble]." *Id.* ¶ 15.3.E.

Finally, Rumble and the Franchisee Defendants agreed that any violation of the noncompete or nonsolicitation covenants "will cause irreparable injury to [Rumble] for which no adequate remedy at law is available" and that Rumble "shall be entitled to preliminary and permanent injunctive relief and damages, as well as an equitable accounting of all earnings, profits, and other benefits arising from such violation." *Id.* ¶ 13.3.A. The parties also agreed that the Franchisee Defendants must "waive any bond that may be required or imposed in connection with the issuance of any preliminary or provisional relief," *id.*, and that the noncompete provisions are reasonable but, if they are not, "the court is authorized and directed to reduce the scope or duration (or both) of the provision(s) in issue to the extent necessary to render it enforceable," *id.* ¶ 13.3.B. They further agreed that Rumble should be entitled to an injunction, without posting bond, to enforce the franchise agreements' provisions relating to the Franchisee Defendants' use of Rumble's marks and confidential information, the restrictive covenants and posttermination obligations, and "disputes and controversies based on or arising under the Lanham Act, or otherwise involving the [Rumble] Marks." *Id.* ¶ 16.5.

Under these terms, Rumble shared with the Franchisee Defendants extensive proprietary materials about Rumble's franchising system and specialized training. Higham Decl. ¶¶ 13–17, 42–43; Downtown Franchise Agreement ¶¶ 5.5, 6.3–6.4; South Tampa Franchise Agreement ¶¶ 5.5, 6.2–6.3. These materials included access to a "proprietary initial franchise partner training program," an operations manual, "instructions regarding Rumble's confidential and proprietary operations" and franchise system, Rumble's confidential online learning management system, an owner/operator training module, studio management training, "Rumble's integrated proprietary operating systems and software," "ongoing advisory assistance regarding the development and operation of the Franchisee Defendants' Studios," and ongoing training programs. Higham Decl. ¶ 14.

### C. The Defendants' Business Relationships

Hunt was an operating partner and Vice President of Strategic Growth at the Franchisee Defendants' former studios. Higham Decl. ¶¶ 19, 31, 35; Ex. O (Doc. 5-15), Ex. R (Doc. 5-18). She was also a fitness instructor at those studios. Compl. ¶ 51. Hunt cofounded Temper with Taylor and Will Montanez. Tr. 105:19–106:19.

On July 16, 2026, Taylor registered Temper as a Florida limited liability corporation with its principal address at the Downtown Studio's location, 119 West Tyler Street. Ex. E, Temper Articles of Organization (Doc. 53-5). Temper

is "intended to be [a] boutique fitness business" and brands itself as "Tampa's first personalized gym experience." Tr. 112:6–8; Ex. H (Doc. 53-8).

### D. The Relationship Between Rumble and the Franchisee Defendants

On July 20, 2026, the Franchisee Defendants informed Rumble that they had stopped operating their Rumble studios on July 18, 2026. Ex. D (Doc. 53-4). According to Rumble, it then learned that Taylor had recently registered Temper and suspected that Taylor and Hunt intended to rebrand their former Rumble studios into Temper studios. Higham Decl. ¶ 19.

Around July 1, 2026, Hunt sent an email to the Rumble studios' customers explaining that "Rumble Tampa" is "relaunching" and "becoming TEMPER," with the "same two locations" and a "completely rebuilt experience," and that changes were a "rebuild," not a "rebrand." Ex. G (Doc. 53-7); Tr. 47:4–7.[2] The email further explained that "TEMPER is a fitness studio built around knowing you completely" and that "[b]oxing and strength stay at the center" but that Temper would "add[] mobility, conditioning, and a coaching system." Ex. G. The email concluded that "[b]oth locations will temporarily close on July 17, 2026[,] for renovations as [they] relaunch" and that any studio access and program credits "will carry forward." *Id.*

[2] Rumble Tampa is sometimes used to refer to the Franchisee Defendants' two former Rumble studios collectively.

Then, on July 18, 2026, Hunt sent a text message to Rumble Tampa customers using Rumble's member-management system. Ex. I (Doc. 53-9). The text message reads in relevant part:

> Hey everyone! Haley here, co-founder of TEMPER. We officially kick off Forge on Monday, and we couldn't be more excited to get our community back together while we build what's next. Please complete the registration form before attending your first workout—it includes the schedule, workout details, location, and waiver: [web address omitted]. Questions? Text me directly at [telephone number omitted]. If you're a former member who received this text, we'd love to have you join us—your first week of Forge is on us!

*Id.* The registration form linked in the text message is titled "Forge x Summer Series Workouts" and explains that "Forge Programming" "follows a structured weekly progression, with each day serving a different purpose." *Id.* The different workout themes include "POWER," which entails "Boxing + Strength"; "CONDITIONING," which entails "HIIT + Running"; "BUILD," which entails "Mobility + HIIT + Strength"; and "FINISH," which entails "Endurance + Team Games." *Id.*

On August 7, 2026, Rumble sent all the defendants a notice of termination exercising its right to immediately terminate the franchise agreements and demanding that the Franchisee Defendants comply with the agreements' posttermination obligations. Ex. F (Notice of Termination) (Doc. 53-6); Higham Decl. ¶¶ 20–21; Franchise Agreements ¶ 15.1.A(4). The notice

also demanded Hunt's and Temper's compliance with the agreements' restrictive covenants, requested that they cease operating the Temper studio in active concert and participation with the Franchisee Defendants, and directed Hunt to remove her online associations with Rumble. Notice of Termination at 5. It further notified the Franchisee Defendants that they cannot operate a competing business or solicit Rumble's customers indirectly through Hunt or Temper, and explained that the Franchisee Defendants and Hunt had violated the franchise agreements by sending an email and text message advertising Temper to former Rumble studio members, hosting Temper workouts in the South Tampa Studio's parking lot, and continuing to display Rumble's marks at the former Rumble studios. *Id.* at 2–3.

At the preliminary-injunction hearing, Taylor testified that he did not remember whether he authorized Hunt to send the July 1 email and July 18 text message but that she "absolutely" had the right to do so without his prior approval. Tr. 113:14–21. When asked why Taylor allowed Hunt to send these solicitations despite the franchise agreements' restrictive covenants, Taylor said, "I was going to do what's [in] the best interest for me." Tr. 114:9–12.

Then, according to the defendants' counsel, Temper hosted "four or five classes" in the South Tampa Studio's parking lot. Tr. 177:4–15. A former Rumble Tampa customer posted a photograph of one of these workouts to her Instagram account on July 31, 2026. Ex. O (Doc. 53-13); Higham Decl. ¶ 31.

This post tagged "@tempertampabay" and was reposted by Taylor and Hunt. Higham Decl. ¶ 31. When asked at the hearing, Taylor admitted that he had participated in Temper fitness classes that took place in the South Tampa Studio's parking lot. Tr. 111:6–112:7. In contrast to this evidence and counsel's admissions, Taylor asserts in his declaration that "[t]here have been no sales, distribution or advertising of any goods and services" and "[a]bsolutely no business has occurred at" the former studios since July 18, 2026. Taylor Decl. (Doc. 35-1) ¶¶ 18–19. When pressed at the hearing whether Temper was operating at that time, Taylor responded that he does not "have enough experience to know the legal definition of what operating means." Tr. 112:4–5.

When these workouts occurred, Rumble's marks were on display at the South Tampa Studio on the building and the shopping center's monument sign. *See* Ex. N (Doc. 53-14). The defendants removed most, but not all, of Rumble's marks from the former studios on September 4, 2026, in conjunction with their response to Rumble's motion for a preliminary injunction. Taylor Decl. ¶ 20. But a Rumble tenant panel and a window decal bearing Rumble's contact information were still on display at the South Tampa Studio on October 5, 2026. Ex. D-1 (Doc. 53-30).

Further, Taylor's, Hunt's, and Temper's social media accounts continued to associate them with Rumble after the termination of the franchise agreement. When this lawsuit was filed, Taylor's LinkedIn profile stated that

he was a Rumble Franchise Owner from November 2021 to "Present," and Hunt's LinkedIn profile stated that she was a Rumble Operating Partner from February 2023 to "Present." Ex. O (Doc. 53-15). And Hunt's LinkedIn profile picture showed her wearing Rumble-branded attire, including boxing gloves. *Id.* After the lawsuit was filed, Taylor updated his LinkedIn profile's employment history to accurately reflect the end of his relationship with Rumble, and Hunt updated her profile to replace her profile picture but did not correct her employment history. Ex A-1 (Doc. 53-27).

Taylor's Instagram profile displays posts by him showing Rumble-branded boxing equipment. Ex. M (Doc. 53-13). It also displays tagged posts by others that include Rumble's marks. *E.g.*, *id.* at 4 (showing Taylor wearing Rumble attire); *id.* at 5 (showing a Rumble-branded storefront). Hunt's Instagram profile likewise displays several photographs of her wearing Rumble-branded attire. Ex R (Doc. 53-18); Ex. B-1 (Doc. 53-28). Temper's Instagram account displays several "tagged" posts that display photographs that include Rumble's marks. Ex. L (Doc. 53-12). Some of these tagged posts predate the franchise agreements' termination. *E.g.*, Ex. K (Doc. 53-11) (posted May 5, 2026, and tagging "@tempertampabay").

When this lawsuit was filed, the Franchisee Defendants' Yelp page for the Downtown Studio was active and included Rumble marks. Higham Decl. ¶ 36 (citing (Doc. 5-19)). The Yelp page now reads that "Yelpers report this

location has closed." Ex. Y (Doc. 53-25) at 2; Tr. 100:14–16. But it still lists a telephone number that, until October 2 or 3, had a voicemail greeting that said, "Thanks for calling Rumble Boxing Tampa." Ex. Y at 3; Higham Decl. ¶ 36; *see* Tr. 41:20–42:2.

## II. LEGAL STANDARDS

To obtain a preliminary injunction, a party must demonstrate "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered in the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the nonmovant; and (4) that the entry of the relief would serve the public interest." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005); *see also Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (applying the test to a preliminary injunction in a Lanham Act case).

## III. ANALYSIS

### A. Rumble Is Likely to Prevail on the Merits of Some Claims

Rumble is likely to succeed on the merits of its trademark, breach-of-contract, and tortious-interference claims. It is not likely to succeed on the merits of its civil conspiracy claim.

### i. Trademark Infringement and False Designation of Origin

Rumble is likely to prevail on its trademark-infringement and false-designation-of-origin claims. The standard for the two claims is the same, so I analyze them as one. *See Tim Hortons USA, Inc. v. Tims Milner LLC*, No. 18-cv-24152, 2019 WL 2515006, at *4 (S.D. Fla. June 17, 2019) (citations omitted).

To prevail on a claim of trademark infringement, a plaintiff must establish that (1) the plaintiff possesses a valid mark, (2) the defendant used the mark, (3) the defendant's use of the mark occurred "in commerce," (4) the defendant used the mark "in connection with the sale . . . or advertising of any goods," and (5) the defendant used the mark in a manner likely to confuse customers. *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1218 (11th Cir. 2008) (citations omitted). Here, the defendants argue only that Rumble cannot establish the third and fourth element. Resp. (Doc. 35) at 7. I nonetheless address each element in turn.

#### a. Rumble possesses valid marks.

First, Rumble possesses valid marks that it alleges the defendants are infringing. Rumble has registered these marks with USPTO, *see* Ex. A, so there is a rebuttable presumption that they are valid, *see Matal v. Tam*, 582 U.S. 218, 226–27 (2017). Because the defendants do not dispute that these marks are valid, they do not rebut this presumption.

**b. The defendants used Rumble's marks.**

Second, the defendants used Rumble's marks at times relevant to this action. The Franchisee Defendants used Rumble's marks in exterior signs and window graphics at the Downtown Studio and South Tampa Studio and on the Downtown Tampa Studio's Yelp page. Ex. Q (Doc. 53-17); Ex. S (Chartier Decl.) (Doc. 53-19); Ex. Y (Doc. 53-25). Taylor, Hunt, and Temper used Rumble's marks when hosting a fitness program directly in front of the marks on July 31 and August 1, 2026, Second Higham Decl. (Doc. 53-21) ¶ 4, and on their Instagram pages, Ex. L (Doc. 53-12); Ex. M (Doc. 53-13); Ex. R (Doc. 53-18). Taylor and Hunt also used Rumble's marks on their LinkedIn pages. Ex. O (Doc. 53-15).

Although the defendants do not dispute that they used Rumble's marks, they argue that some of the alleged uses of Rumble's marks cannot be attributed to them. Specifically, they contend that Rumble "actually controls many of the social media accounts related to the Studios" and so it "has the power to remove anything it finds offending on those accounts." Resp. at 10. Other than the Downtown Studio's Yelp page, the defendants do not specify which social media accounts are controlled by Rumble and have offered no evidence to suggest that they do not control their own social media accounts. *Id.* In fact, Rumble has established that Taylor controls the Downtown Tampa Studio's Yelp page. Second Higham Decl. ¶ 9. And nothing in the record

suggests that the defendants do not control their own Instagram and LinkedIn accounts. Thus, the defendants' argument that they did not infringe Rumble's trademarks because they do not control their social media accounts is unpersuasive.

Likewise, at the evidentiary hearing, the defendants explained that some of the Instagram posts on Taylor's, Hunt's, and Temper's profiles were not made by Taylor and Hunt but merely "tagged" them. Tr. 29:3–8. But Rumble does not argue that the defendants are using Rumble's marks by failing to "untag" themselves from other users' posts. Instead, Rumble argues that the other users' posts "associating Temper and Rumble together" are evidence that customers are "confused into believing that Rumble endorses [the defendants'] competing business and services," PI Mot. at 13, and that the defendants have breached and tortiously interfered with the Franchise Agreements by continuing to associate themselves with Rumble after termination, *id.* at 20. Therefore, I need not consider whether the defendants' failure to remove themselves from these "tagged" posts is a "use" under the Lanham Act.

Next, the Franchisee Defendants argue that they are not responsible for the continued display of a Rumble tenant panel at the South Tampa Studio. Tr. 175:17–176:19. They do not provide or describe the lease agreement, and Taylor admits that he has not asked his landlord to remove the tenant panel

because he "didn't want to jeopardize any professional pathways going forward by not being honest with [his] landlord." Tr. 96:25–97:8. At the same time, Taylor plans to reopen the studio, Tr. 114:14–18, and Hunt and Temper have provided group fitness services in vicinity of the sign, Second Higham Decl. ¶ 4. And, either way, the Franchisee Defendants are indisputably responsible for their continued display of Rumble window graphics at the South Tampa Studio, which is a "use" under the Lanham Act. Tr. 96:25–97:4 (Taylor admitting that he "forgot to remove" the window graphics despite his declaration that the "window graphics at the Studios were removed on September 4, 2026" (discussing Taylor Decl. ¶ 20)).

At this stage, Rumble has likely established that the defendants' failure to remove the Rumble tenant panel despite advertising and providing services near it is a "use" under the Lanham Act.

**c. The defendants used Rumble's marks "in commerce."**

Third, the defendants used Rumble's marks in commerce. The "in commerce" requirement is a "jurisdictional predicate" that encompasses "all commerce which may lawfully be regulated by Congress," *N. Am. Med. Corp.*, 522 F.3d at 1218 n.5, including the use of a mark in one state that "impact[s] . . . the interstate use of the trademark." *World Carpets, Inc. v. Dick*

*Littrell's New World Carpets*, 438 F.2d 482, 488 (5th Cir. 1971).[3] Here, given that Rumble has franchises throughout the United States, the alleged misuse of its mark undoubtedly can have an interstate effect.

The defendants argue that their use of Rumble's marks on social media and at the "four or five [Temper] classes" does not satisfy the "in commerce" requirement for registering a trademark with USPTO. Tr. 177:4–15. But that is irrelevant to Rumble's trademark-infringement claim because the standard for "in commerce" for trademark infringement under 15 U.S.C. § 1114 is different from the standard for "in commerce" for trademark registration under 15 U.S.C. § 1127. *See N. Am. Med. Corp.*, 522 F.3d at 1220 n.7 (citing J. T. MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:11.50 (4th ed., 2003)). Thus, Rumble carries its burden to show that the defendants used its marks "in commerce."

**d. The defendants used Rumble's marks in connection with the sale or advertising of services.**

Fourth, the defendants used Rumble's marks in connection with the sale or advertising of services. "In connection" requires a showing of "use of any type" connected to the sale or advertising of services. *CHHJ Franchising LLC*

[3] The Eleventh Circuit has adopted as binding precedent all decisions issued by the former Fifth Circuit prior to October 1, 1981. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

*v. Spaulding*, No. 8:23-cv-1979-WFJ-AAS, 2024 WL 229406, at *3–4 (M.D. Fla. Jan. 22, 2024) (quoting *VersaTop Supp. Sys., LLC v. Ga. Expo, Inc.*, 921 F.3d 1364, 1369 (Fed. Cir. 2019)). "This is a broad standard," *id.* (citation omitted), that includes not only the sale of infringing goods or services but also "any marketing, advertising, [or] distributing activities." *Jekyll Island-State Park Auth. v. Polygroup Macau Ltd.*, 140 F.4th 1304, 1327 (11th Cir. 2025) (quoting *Hetronic Int'l, Inc. v. Hetronic Germany GmbH*, 99 F.4th 1150, 1167 (10th Cir. 2024)).

The defendants concede that the marks were displayed at the studios but assert that "[a]bsolutely no business has occurred since [July 18, 2026]," when the Franchisee Defendants terminated the Franchise Agreements. Resp. at 8 (citing Taylor Decl. ¶ 19). The record contradicts this assertion. As discussed above, Hunt conducted Temper workouts directly in front of the South Tampa Studio on at least July 31, 2026, and August 1, 2026.

Further, Taylor and Hunt used Rumble's marks on social media. While Taylor and Hunt were promoting Temper, their LinkedIn profiles indicated that they were "[p]resent[ly]" affiliated with Rumble, and Hunt's profile picture showed her in Rumble attire. Ex. O (Doc. 53-15) at 1, 3–6. This use of Rumble's marks on a professional networking site easily meet the "broad standard" that encompasses "any marketing[] [or] advertising . . . activities." *See Jekyll Island-State Park Auth.*, 140 F.4th at 1327 (citation omitted).

More, the defendants plan to reopen the former Rumble studios. Taylor testified that when he intends to reopen the studios "[d]epend[s] on how [the evidentiary] hearing goes." Tr. 114:14–15. Hunt sent an email using Rumble's content management system, ClubReady, to former Rumble members explaining that they are "relaunching" and that "Rumble Tampa is becoming TEMPER," which will be a fitness studio with "[b]oxing and strength . . . at the center." Ex. G. This email was signed by Hunt and Temper's third cofounder, Montanez. *Id.* Further, on August 27, Hunt made an Instagram post with her, Taylor, and Montanez, explaining that "building something cool is fun" and that they are "coming back." Ex. X. The record therefore shows that the defendants used Rumble's marks while marketing or advertising a competing service.

**e. The defendants used Rumble's marks in a manner likely to confuse customers.**

The defendants used Rumble's marks in a manner likely to confuse customers. Because the defendants do not dispute that their use of Rumble's marks is likely to confuse consumers (nor would that argument be persuasive in the light of the evidence offered), I do not examine each likelihood-of-confusion factor in detail at this stage. *See Savannah Coll. of Art and Design, Inc. v. Sportswear, Inc.*, 983 F.3d 1273, 1281 (11th Cir. 2020) (explaining that a "district court need not consider all factors in every case").

To be sure, "[c]ommon sense compels the conclusion that a strong risk of consumer confusion arises when a terminated franchisee continues to use the former franchisor's trademarks." *Burger King Corp. v. Mason*, 710 F.2d 1480, 1492 (11th Cir. 1983). Here, the defendants are using Rumble's exact marks in connection with a competing business that offers boxing-, HIIT-, and strength-related fitness programming like Rumble's at the same retail outlets as the former Rumble franchises and to some of the same customers. More, Temper's Instagram page is replete with tagged posts featuring Rumble marks. *E.g.*, Ex. L (Doc. 53-12). It is thus clear that the defendants' misuse of Rumble's trademarks is likely to confuse consumers.

Indeed, some of Rumble's customers seem actually confused about the defendants' relationship with Temper. For example, in late July 2026, a customer made an Instagram post that tagged "@tempertampabay" and "#rumbleboxing." Ex. K (Doc. 53-11) at 2–3.

Accordingly, Rumble has shown that the defendants are using Rumble's marks in a manner likely to confuse customers.

#### f. Taylor's and Hunt's use of Rumble marks is not nominative fair use.

Taylor and Hunt argue that their use of Rumble's marks on their LinkedIn profiles is permissible under the doctrine of nominative fair use.

Resp. at 9. Because their misleading use of Rumble's marks on LinkedIn conveys Rumble's sponsorship or endorsement, I disagree.

The Eleventh Circuit has "not yet addressed whether nominative fair use is an affirmative defense to trademark infringement claims under the Lanham Act" or instead a factor in the likelihood-of-confusion prong of the trademark-infringement test. *Parsons v. Regina*, 847 F. App'x 766, 773 & n.13 (11th Cir. 2021) (per curiam). Some district courts in the Eleventh Circuit have analyzed a nominative-fair-use argument under the Ninth Circuit's test that treats nominative fair use as an affirmative defense. *See, e.g.*, *Commodores Ent. Corp. v. McClary*, 314 F. Supp. 3d 1246, 1249 (M.D. Fla. 2018) (*Commodores II*); *Earth, Wind, and Fire IP, LLC v. Substantial Music Grp. LLC*, 720 F. Supp. 3d 1261, 1273 (S.D. Fla. 2024) (applying *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 308 (9th Cir. 1992)). The Eleventh Circuit has applied the Ninth Circuit's test arguendo, so I do the same. *See Parsons*, 847 F. App'x 773–74.

"Nominative fair use occurs when 'the defendant has used the plaintiff's mark to describe the plaintiff's product for the purposes of . . . comparison to the defendant's product.' " *Parsons*, 847 F. App'x at 773 (emphasis omitted). To establish nominative fair use, the defendant must establish that (1) the plaintiff's "product of service is not readily identifiable without use of the trademark"; (2) the defendant "used only so much of the mark as is reasonably

necessary to identify the plaintiff's product or services"; and (3) "the user of the mark does nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder." *Id.* at 773–74 (quoting *Commodores II*, 314 F. Supp. 3d at 1250).

Here, Rumble alleges that the defendants are impermissibly using Rumble's marks on Taylor's and Hunt's LinkedIn profiles, other social media, and Yelp. Compl. ¶¶ 60–61, 63. Specifically, Rumble alleges that Taylor's and Hunt's LinkedIn profiles state that they are current a Rumble franchise owner and franchise operating partner, respectively. *Id.* ¶ 60. Rumble supports this allegation with screenshots filed as an exhibit to the complaint, *see* Ex. R (Doc. 1–19), but adds in a later declaration that Taylor updated his LinkedIn profile after the complaint was filed to show that he is a former Rumble franchise owner, *see* Second Higham Decl. ¶ 7 (citing Ex. W (Doc. 42-5) at 8–9). Rumble also offers evidence that Hunt's LinkedIn profile picture shows her wearing clothes with a Rumble logo. Ex. O.

Taylor's and Hunt's inaccurate associational history is not nominative fair use. By conveying that Taylor and Hunt are current Rumble franchise owners, they impermissibly "suggest sponsorship or endorsement by the trademark holder." *See Parsons*, 847 F. App'x at 774. Specifically, Taylor's and Hunt's employment descriptions that indicate that their employment with

Rumble continues to the "present" is not nominative fair use. Nor is Hunt's LinkedIn profile picture, which shows her in Rumble attire.

In contrast, Taylor's updated employment description that accurately reflects his former relationship with Rumble does not suggest Rumble's continued sponsorship or endorsement and therefore is nominative fair use. *See Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1138 (11th Cir. 2018) (*Commodores I*).

**ii. Rumble is likely to prevail on the merits of its breach-of-contract claim.**

To prevail on a breach-of-contract claim under Florida law, a plaintiff must show that there was a valid contract, material breach, and damages. *See Rauch, Weaver, Norfleet, Kurtz & Co., Inc. v. AJP Pine Island Warehouses, Inc.*, 313 So. 3d 625, 630 (Fla. 4th DCA 2021) (citation omitted). Applying these standards here, I conclude that Rumble is likely to prevail on the merits of its breach-of-contract claim. The defendants do not dispute that the Franchise Agreements were valid contracts or that the alleged breaches caused Rumble to suffer damages. Instead, they argue only that the noncompete covenants are unenforceable because they are overbroad and that they cannot be responsible for Hunt's and Temper's acts.

**a. The restrictive covenants and posttermination obligations are valid contracts.**

A valid contract requires an offer, an acceptance, consideration, and sufficient specification of essential terms. *Rauch*, 313 So. 3d at 630 (citation omitted). Here, the restrictive covenants and posttermination obligations are evidenced in writing in the franchise agreements, and there is no dispute that these provisions are the result of an offer, an acceptance, and valid consideration, and adequately specify their essential terms. These contract provisions are therefore valid.

**b. The Franchisee Defendants materially breached the restrictive covenants and posttermination obligations.**

"To constitute a vital or material breach, a party's nonperformance must 'go to the essence of the contract.'" *MDS (Canada) Inc. v. Rad Source Techs., Inc.*, 720 F.3d 833, 849 (11th Cir. 2013) (per curiam) (citation omitted). "As a general rule, '[t]he issue of whether an alleged breach is vital or material is reviewed as a question of fact.'" *O'Donnell v. Lee*, 387 So. 3d 447, 453 (Fla. 1st DCA 2024) (citation omitted).

Here, the Franchisee Defendants' breaches of the noncompete covenant, nonsolicitation covenant, and posttermination obligations are material. First, the Franchisee Defendants materially breached the noncompete covenant by creating and operating a competing fitness business during and after the term

of the franchise agreements. *See* Franchise Agreements ¶ 13.1. After Temper's cofounders, Hunt and Montanez, emailed the Franchisee Defendants' customers announcing that "Rumble Tampa [was] becoming TEMPER" and would continue to provide fitness services with "[b]oxing and strength . . . at the center," Ex. G (Doc. 53-7), Taylor officially registered Temper, Ex. E. Taylor's involvement with Temper plainly violates the letter and spirit of the noncompete covenants. More, these acts caused Three South Tampa and One Hillsborough to breach because they agreed that their "principals, owners, or guarantors," which include Taylor, may not operate a competing business. Franchise Agreements ¶ 13.1.

Second, the Franchisee Defendants materially breached the nonsolicitation covenant by diverting their former Rumble studio's customers to Temper. Although Taylor did not send the email advertising Temper to his Rumble customers, he knew that Hunt did so and testified that he approved Hunt's conduct because he "was going to do what's in the best interest for" him. Tr. 114:9–12. At this early stage, Rumble has shown that Taylor likely participated in Hunt and Temper's solicitation efforts.

Third, the Franchisee Defendants materially breached the posttermination obligations by retaining Rumble's confidential information, failing to comply with the restrictive covenants, and failing to disassociate with Rumble. In particular, the franchise agreements required the Franchisee

Defendants to, "at [their] own expense, remove and cease using or displaying all signs, obliterate or remove all letterheads, labels or any other item or form of identification that would in any way link or associate [the Franchisee Defendants], its goods and/or services with [Rumble]," and to stop using Rumble's marks, confidential information, and other intellectual property. Franchise Agreements ¶ 15.3.A. The plain language of this provision encompasses the Franchisee Defendants' social media activity associating them with Rumble. *See Equity Lifestyle Props., Inc. v. Fla. Mowing and Landscape Serv., Inc.*, 556 F.3d 1232, 1242 (11th Cir. 2009) ("In interpreting a contract under Florida law, we give effect to the plain language of contracts when that language is clear and unambiguous."). It requires the Franchisee Defendants to disassociate themselves from nonparties' posts that "tag" or otherwise associate the Franchisee Defendants with Rumble by removing these associations to the extent possible. Accordingly, by failing to remove his and Temper's online associations with Rumble, Taylor is materially breaching the posttermination obligations.

Each breach goes to the essence of the contract and is therefore material.

**c. The Franchisee Defendants' breach caused Rumble to incur damages.**

Because Rumble has established that the Franchisee Defendants' breach has confused and diverted customers and eroded the goodwill associated with

the Rumble brand, *see* Second Higham Decl. ¶ 10, I conclude that Rumble has likely shown that it incurred damages as a result of the Franchisee Defendants' breach.

**d. The noncompete covenants are likely valid restraints on trade.**

"Section 542.335 [of the Florida Statutes] does not protect covenants 'whose sole purpose is to prevent competition per se' because those contracts are void against public policy." *Rauch*, 313 So. 3d at 630 (quoting *White v. Mederi Caretenders Visiting Servs. of Se. Fla., LLC*, 226 So. 3d 774, 785 (Fla. 2017)). Instead, "a contract providing restrictions on competition must involve a legitimate business interest as defined by statute to be enforceable." *Id.* (quoting *White*, 226 So. 3d at 779). Accordingly, a party seeking to enforce a restrictive covenant must prove (1) "the existence of one or more legitimate business interests justifying the restrictive covenant" and (2) "that the contractually specified restraint is reasonably necessary to protect the legitimate business interest or interests justifying the restriction." §§ 542.335(1)(b)–(c); *see Rauch*, 313 So. 3d at 630 (citing *White*, 226 So. 3d at 779).

First, Rumble has established that it has legitimate business interests that justify the noncompete covenants. According to Rumble's general counsel's uncontested assertions, the purpose of the noncompete, nonsolicitation,

confidentiality, and posttermination provisions is to "protect Rumble and its franchise System, Rumble's proprietary and Confidential Information (including its customer data), and Rumble's Marks and their related goodwill." Higham Decl. ¶ 41. They are further designed to "prevent the Franchisee Defendants, and those in active concert and participation with them, from using the specialized training, operational know-how, and Confidential Information—including Rumble's customer data—that they acquired as Rumble® franchisees, as well as to protect the goodwill associated with the Rumble® brand in Tampa, Florida, and Rumble's ability to re-franchise the territories and retain customer loyalty." *Id.* ¶ 42. These business interests are legitimate under Florida law. *See* § 542.335(1)(b), Fla. Stat.

Second, Rumble has established that the noncompete covenant is reasonably necessary to protect its legitimate business interests. The noncompete covenant prohibits the Franchisee Defendants and other restricted parties from operating a competing business, which the covenant defines as "any fitness or exercise business, any fitness or exercise marketing or consulting business, any business offering products of a similar nature to those of the [Rumble] Studio, or [ ] any business or entity which franchises, licenses or otherwise grants to others the right to operate such aforementioned businesses" for two years within ten miles of any Rumble studio that exists or was in development when the franchise agreements were terminated.

Franchise Agreements ¶ 13.1. The Franchisee Defendants argue that these restrictions are overbroad and must be narrowed to apply only to "businesses using boxing inspired workouts." Resp. at 12.

Although the noncompete covenant defines a competing business broadly as one involved in the fitness or exercise business, it is neither overbroad nor solely intended to prevent competition. Rumble permitted the Franchisee Defendants, like all its franchisees, to use its confidential information and goodwill on the condition that they not suddenly terminate the franchise agreements and use that confidential information and goodwill to their advantage. Higham Decl. ¶ 41. The commercial advantages that the Franchisee Defendants can derive from Rumble's confidential information and goodwill apply generally to managing a fitness or exercise business and are not necessarily limited to boxing-inspired group classes only. And the noncompete covenant fairly protects Rumble's ability to reestablish itself in the Tampa market—especially given that the defendants have already unlawfully used Rumble's customer data to promote a competing business. *See Peterbrooke Franchising of Am., LLC v. Miami Chocolates, LLC*, 312 F. Supp. 3d 1325, 1338 (S.D. Fla. 2018) (explaining that protecting a franchisor's right to reestablish itself is a legitimate business interest). Finally, these restrictions are limited to two years and apply only within a ten-mile radius of Rumble studios. The modest geographic and timeframe limitations doubly make the restrictions

reasonably necessary to protect Rumble's legitimate business interests. Indeed, the Franchisee Defendants may operate a fitness or exercise business now, so long as they do so beyond ten miles of a Rumble studio, which, in Tampa, is just the Franchisee Defendants' two former studios. Accordingly, the restrictive covenants are valid under Florida law, and I decline the Franchisee Defendants' invitation to narrow them.

#### iii. Rumble is likely to prevail on the merits of its tortious-interference claim.

Rumble is likely to prevail on the merits of its claims that Hunt and Temper tortiously interfered with the franchise agreements. *See* Compl. ¶¶ 105–10.

Under Florida law, a tortious-interference claim has four elements: (1) existence of a business relationship including one evidenced by an enforceable contract, (2) the defendant's knowledge of that relationship, (3) the defendant's intentional and unjustified interference with the relationship, and (4) damage to the plaintiff as a result of the breach of the relationship. *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985). First, the franchise agreements are evidence that a business relationship existed between Rumble and the Franchisee Defendants and that Rumble has contractual rights under this relationship.

Second, Hunt knew about the business relationship between Rumble and the Franchisee Defendants through her employment at the Franchisee Defendants' Rumble studios. After initially evading the question, she admitted as much at the evidentiary hearing. Tr. 145:8–10.

Third, Hunt and Temper interfered with the franchise agreements intentionally and without justification. This element requires Rumble to "prove that the defendant[s] manifested a specific intent to interfere with the business relationship," *see Fiberglass Coatings, Inc. v. Interstate Chem., Inc.*, 16 So. 3d 836, 838 (Fla. 2d DCA 2009) (citation omitted), and is satisfied when a nonparty induces or otherwise causes the contracting party's violation of the contract, *see Gossard v. Adia Servs., Inc.*, 723 So. 2d 182, 184 (Fla. 1998) (applying RESTATEMENT (SECOND) TORTS, § 766 (1979)).

At this stage, Rumble has shown that Hunt likely had a specific intent to interfere with the franchise agreements. The defendants do not argue that Hunt did not know about the agreements or otherwise did not intend to interfere with them. At the hearing, Hunt evaded questions as to whether she knew about the franchise agreements before finally admitting that she had "been in the franchise industry for quite some time" and knew that the Franchisee Defendants' Rumble studios were being operated under franchise agreements. Tr. 144:6–145:10; *see id.* at 139:19–22 (requesting that Rumble's counsel rephrase the question whether Hunt was "aware that Mr. Taylor was

operating his Rumble studios pursuant to a franchise agreement"); *id.* at 139:23–140:16 (continuing to evade the question). When asked about the franchise agreements' noncompete obligations, Hunt testified that she had "short-term memory loss." *Id.* at 143:23–144:2. Hunt likewise refused to give a clear answer as to when Taylor approached her about Temper and denied that they had ever discussed that they would be violating the franchise agreements by operating a competing business. *Id.* at 143:23–144:1. She also said that she did not recall discussing the notice of termination with Taylor. *Id.* at 161:12–16. And, when asked about her Instagram post with a picture showing her, Taylor, and Montanez at a working lunch with a caption that reads, in part, "building something cool is fun" and Hunt's accompanying reply that reads "we're coming back," Hunt said she was "probably not" talking about Temper and instead was just "talking about the food." Ex. X; Tr. 166:1–7. This testimony is not credible.

Specifically, given Hunt's role as operating partner at the Franchise Defendants' Studios and her extensive familiarity with the franchise industry, I find Hunt's testimony that she does not recall knowing about the restrictive covenants despite remembering contemporaneous events not credible. Based on Hunt's noncredible testimony, knowledge of the franchise agreements, familiarity with franchising, and egregious conduct (e.g., using Rumble's member-management system and customer information to solicit customers

for a competing business), Rumble has made a preliminary showing that Hunt likely intended to interfere with the franchise agreements. Temper's liability attaches through its knowledge about the franchise agreements through its cofounders, Taylor and Hunt.

Further, Hunt and Temper caused the Franchisee Defendants to breach the franchise agreements. The franchise agreements prohibit the Franchisee Defendants from using Rumble's confidential information except as "necessary for the development and operation of the [Rumble] studio," bar operating a competing business, and disallow diverting Rumble's customers. Franchise Agreements ¶¶ 12, 13. By using Rumble's confidential information to solicit customers and hosting group fitness classes in concert with Taylor, Hunt and Temper caused the Franchisee Defendants to breach the franchise agreements.

Fourth, as discussed above, Rumble has established that it has suffered damages as a result of the Franchisee Defendants' breach of contract.

Therefore, Rumble is likely to prevail on the merits of its tortious-interference claim.

**iv. Rumble is not likely to prevail on the merits of its civil-conspiracy claim.**

Finally, I conclude that Rumble is not likely to prevail on the merits of its claim that all the defendants conspired to evade the franchise agreements and infringe Rumble's trademarks. *See* Compl. ¶¶ 111–15.

To plead civil conspiracy, Rumble must allege "an agreement between two or more people to achieve an illegal objective, an overt act in furtherance of that illegal objective, and a resulting injury to the plaintiff." *Wainberg v. Mellichamp*, 93 F.4th 1221, 1225 (11th Cir. 2024) (quoting *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) (en banc)). "Under Florida law, the gist of a civil conspiracy is not the conspiracy itself but the civil wrong which is done through the conspiracy which results in injury to the [p]laintiff." *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1067 (11th Cir. 2007) (quotations omitted)). In other words, "a civil conspiracy must have as its object the commission of an underlying tort." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1281 (11th Cir. 2009).

Under Florida's intracorporate-conspiracy doctrine, "it is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself." *Mancinelli v. Davis*, 217 So. 3d 1034, 1037 (Fla. 4th DCA 2017) (quoting *Dickerson v. Alachua Cty. Comm'n*, 200 F.3d 761, 767 (11th Cir. 2000)). Nor is it possible for multiple agents of the same corporation to conspire with one another within the scope of their agency relationship absent an independent personal stake. *Id.*; *see McAndrew*, 206 F.3d at 1036 (applying federal law).

Here, Taylor, Hunt, and Temper cannot have conspired with one another within the scope of Taylor's and Hunt's agency relationship with Temper.

Although Taylor and Hunt likely infringed Rumble's trademarks, their infringing conduct occurred after they cofounded Temper and in the operation of Temper. Similarly, although Hunt and Temper likely tortiously interfered with the franchise agreements by soliciting Rumble customers and operating a competing business, they did so for the benefit of Temper.

Rumble's civil-conspiracy claim is unlikely to succeed for the additional reason that the Franchisee Defendants cannot be liable for interfering with their own contracts. *Essex Capital Grp., Inc. v. Warnell*, No. 8:24-cv-529-KKM-LSG, 2024 WL 4956731, at *5 (M.D. Fla. Dec. 3, 2024) (quoting *Richardson v. Progressive Am. Ins. Co.*, No. 2:18-cv-715, 2019 WL 2287955, at *8 (M.D. Fla. May 29, 2019)). Under Florida law, "tort liability arising from conspiracy presupposes that the coconspirator is legally capable of committing the tort." *Id.* (quoting *In re January 2021 Short Squeeze Trading Litig.*, 584 F. Supp. 3d 1161, 1203 (S.D. Fla. 2022)).

### B. Rumble Will Suffer Irreparable Harm Absent a Preliminary Injunction

The second factor in determining whether a preliminary injunction is appropriate requires Rumble to show that it will suffer irreparable harm absent one. *See Schiavo*, 403 F.3d at 1225–26. I conclude that Rumble makes this showing.

Rumble is entitled to a rebuttable presumption of irreparable harm with respect to its trademark claims because it is likely to succeed on the merits of those claims. *See* 15 U.S.C. § 1116(a); *The Filta Group v. LXU, Ltd.*, No. 6:25-cv-914, 2025 WL 3718465, at *4 (M.D. Fla. Dec. 23, 2025). The defendants try to rebut this presumption by asserting that they removed "all signage at the non-operating locations" after Rumble sued and "will not use any of [Rumble]'s trademarks in the future." Resp. at 8, 14 (citing Taylor Decl. ¶¶ 20–21). Rumble contradicts the first assertion with evidence that Rumble marks remain—as late as the day before the preliminary-injunction hearing—on display at the South Tampa Studio. Ex D-1 (Doc. 53-30).

In any event, the defendants' voluntary-cessation argument is not persuasive. Although they are correct that, "as a general principle, when conduct sought to be enjoined has ceased and is unlikely to resume, federal courts should not grant injunctive relief," there is still a cognizable danger that the defendants will violate Rumble's trademark rights in the future given their brazen conduct and failure to cease their unlawful actions until Rumble sought injunctive relief. *See Burger King Corp. v. Weaver*, 33 F. Supp. 2d 1037, 1039–1040 (S.D. Fla. 1998) (citation omitted); *Clayton v. Howard Johnson Franchise Sys. Inc.*, 730 F. Supp. 1553, 1558 (M.D. Fla. 1988). To be sure, Taylor and Hunt intimated as much at the evidentiary hearing. Tr. 114:14–15 (Taylor

testifying that when he intends to reopen the studios "[d]epend[s] on how [the] hearing goes").

Rumble will also suffer irreparable harm absent an injunction with respect to the breach-of-contract and tortious-interference claims. Although Florida law states that "[t]he violation of enforceable restrictive covenants creates a presumption of irreparable injury," § 542.335(1)(j), Fla. Stat., this presumption "does not govern in a federal diversity action for a preliminary injunction" because it "conflicts with traditional federal equity practice," *Miller v. Glob. Elec. Testing Servs.*, No. 8:25-cv-1640-KKM-NHA, 2026 WL 35318, at *2 (M.D. Fla. Jan. 6, 2026); *see Vital Pharms., Inc. v. Alfieri*, 23 F.4th 1282, 1293 (11th Cir. 2022) (Pryor, C.J., concurring). Still, without an injunction, Rumble will be forced to compete with its former franchisee, who is unlawfully retaining and using Rumble's confidential information, including its customer data. The harm caused by the Franchisee Defendants' breach is "extremely difficult for a court to determine." *U.S. Lawns, Inc. v. Landscape Concepts of CT, LLC*, No. 6:16-cv-929, 2016 WL 9526340, at *8 (M.D. Fla. Oct. 31, 2026) (citation omitted); *see also Joseph Spine, P.A. v. Moulton*, 346 So. 3d 154, 160 (Fla. 2d DCA 2022) ("[C]ovenants not to compete[] by their nature lend themselves principally to enforcement by injunction because of the difficulty of arriving at a dollar figure for the actual damage done as a result of the breach." (citation omitted)).

Next, the defendants argue that Rumble cannot establish irreparable harm with respect to the breach-of-contract and tortious-interference claims because Rumble offered to sell a "waiver of the immediate non-complete obligations" three weeks before filing its complaint. Resp. at 14–16. Rumble argues that evidence of this offer is inadmissible because it is a protected settlement negotiation and that this offer does not undermine a finding of irreparable harm because it was made before Rumble "became fully aware of the egregious facts demonstrating that [the defendants] have been conspiring since at least May 5, 2026 to evade the noncompete agreement and divert customers to a competing business." Reply (Doc. 42) at 7.

Rumble's offer is admissible to establish irreparable harm. Federal Rule of Evidence 408(a)(1) "renders settlement evidence inadmissible where used to support or dispute 'the validity or amount' of a *claim*, not when offered for a different purpose, like opposing the contention that irreparable harm will occur, absent a preliminary injunction." *Kotori Designs, LLC v. Living Well Spending Less, Inc.*, No. 2:16-cv-637, 2016 WL 6833004, at *3, n.8 (M.D. Fla. Nov. 11, 2016) (citations omitted). And a "court[] may consider otherwise-inadmissible evidence in resolving a motion for a preliminary injunction where 'appropriate given the character and objectives of the injunctive proceeding.'" *Id.* (quoting *Levi Strauss & Co.*, 51 F.3d at 985).

But Rumble's offer does not suggest that it will not suffer irreparable harm absent an injunction. The offer applied only to the "noncompete obligations," not the nonsolicitation covenant or the other posttermination obligations. (Doc. 35-2) at 2. The fact that Rumble was willing to accept a settlement payment, in part to avoid the expense of litigation, does not mean that a court will be able to quantify the damages inflicted by the Franchisee Defendants' breach. *See McDermott, Inc. v. AmClyde*, 511 U.S. 202, 219–20 (1994) ("Because settlement amounts are based on rough estimates of liability, anticipated savings in litigation costs, and a host of other factors, they will rarely match exactly the amounts a trier of fact would have set."); *Murphy v. Fla. Keys Elec. Coop. Ass'n*, 329 F.3d 1311, 1315 n.5 (11th Cir. 2003) (explaining that "multiple factors . . . must be taken into account when making settlement decisions" and that "the settlement figure will rarely match what a trial would have determined to be actual damages owed the plaintiff by the settling defendant").

Further, Rumble made this settlement offer before it was fully aware of the defendants' conduct. Reply at 7. In fact, in the same email conversation as the offer, Taylor had represented that he planned to "open a concept that has zero [intellectual property], brand, and reminisce of Rumble," and Taylor's relationship with Rumble was amicable enough that the two were discussing the possibility of converting the Rumble studios into a different type of studio

under the Everything Brands' umbrella. (Doc. 35-2) at 2–3, 5. According to Rumble's general counsel's uncontroverted declaration, Rumble later discovered the Franchisee Defendants' "efforts to convert Rumble customers and operate a competing business" and that Taylor registered Temper with the Florida Division of Corporations. Second Higham Decl. at ¶ 10. Thus, according to Rumble, the settlement proposal "necessarily reflected an incomplete understanding of [d]efendants' misconduct and the resulting harm to Rumble," and the "harms to Rumble, including damage to customer relationships, goodwill, brand value, and competitive position, are difficult if not impossible to quantify." *Id.* I agree.

Finally, the defendants argue that Rumble will not be irreparably harmed absent an injunction because "there is no business of any kind being conducted at the former locations." Resp. at 16 (citing Taylor Decl. ¶ 19) (emphasis omitted). But, as the record makes clear, this is not true. Hunt and Temper hosted multiple group workouts in the South Tampa Studio's parking lot, Tr. 149:13–14; Second Higham Decl. ¶ 4, and Taylor testified that he intends to open the Temper studio at the former Rumble studio locations depending on how the preliminary-injunction motion is resolved, Tr. 114:14–17, 117:1–4.

### C. The Balance of Harms Favors a Preliminary Injunction

The third factor in determining whether a preliminary injunction is appropriate requires Rumble to show that its threatened injury outweighs the harm a preliminary injunction will cause the defendants. I conclude that Rumble makes this showing.

Rumble is suffering the loss of its confidential business information, which the defendants are using to establish a competing business in flagrant violation of the franchise agreements. This misappropriation disadvantages Rumble vis-à-vis its former franchisee, who agreed not to compete or solicit Rumble customers, and divests Rumble of the "exclusivity and confidentiality of its proprietary and confidential information." *Medi-Weightloss Franchising USA, LLC, v. Sadek*, No. 8:09-cv-2421, 2010 WL 1837767, at *7 (M.D. Fla. Mar. 11, 2010); *see Autonation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1308 (S.D. Fla. 2004). Even more, at least some of Rumble's former customers are confused by the defendants' misuse of Rumble's marks at the former Rumble studios and online. *E.g.*, Ex. K at 3 (Instagram post tagging "@tempertampabay" and "#rumbleboxing").

On the other side, any harm to the defendants "is of their own making due to their conduct in flouting the terms of the contract." *Pirtek USA, LLC v. Layer*, No. 6:05-cv-793, 2005 WL 8159764, at *7 (M.D. Fla. Sept. 23, 2005). "The often painful harm which follows a defendant who willfully breaches a

contractual undertaking is not a basis for denying a plaintiff the relief to which it is legally entitled." *Jiffy Lube Int'l, Inc. v. Weiss Bros, Inc.*, 834 F. Supp. 683, 693 (D.N.J. 1993). And, with respect to trademark infringement, "'[o]ne who adopts the mark of another for similar goods acts at his own peril,' since he has no claim to the profits or advantages thereby derived." *Burger King Corp. v. Majeed*, 805 F. Supp. 994, 1006 (S.D. Fla. Aug. 21, 1992).

### D. A Preliminary Injunction Will Serve the Public Interest

The last factor in determining whether a preliminary injunction is appropriate requires Rumble to show that a preliminary injunction will serve the public interest. I conclude that a preliminary injunction in this case will further the public interest.

The public has an interest in the enforcement of lawful restrictive covenants and trademark law. *See N. Am. Prods. Corp. v. Moore*, 196 F. Supp. 2d 1217, 1231 (M.D. Fla. 2002) (restrictive covenants); *Tim Hortons USA, Inc.*, 2019 WL 2515006, at *6 (trademarks). The injunction here will merely prohibit the defendants from flouting the franchise agreements and trademark law during this litigation and so it will do nothing to adversely affect the public interest.

### E. Injunction Bond

Finally, I consider whether requiring Rumble to post an injunction bond is appropriate. The defendants request a bond of $100,000. Resp. at 18–19.

Under Federal Rule of Civil Procedure 65(c), no preliminary injunction shall issue unless the movant posts bond "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." "[T]he court may elect to require no security at all," *BellSouth Telecommn'cs, Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (quotation omitted), and requiring no security is appropriate when the plaintiff is likely to succeed on the merits and a defendant inflicted costs on itself by failing to comply with a franchise agreement, *see Bahia Bowls Franchising LLC v. DJS LLC,* No. 2:23-CV-94, 2023 WL 2303048, at *9 (M.D. Fla. Mar. 1, 2023).

Rumble argues that imposing a bond is improper because it is highly likely to prevail on the merits and costs and damages to the defendants were self-inflicted. *See* Mot. at 25. I agree that Rumble is likely to prevail on the merits and that the defendants assumed the risk of litigation when they intentionally violated the franchise agreements, so no injunction bond is proper here. Because I conclude that an injunction bond is improper because of Rumble's likelihood of success and the defendants' conduct, I need not consider Rumble's argument that the Franchisee Defendants are barred from requesting an injunction bond by the franchise agreements. Reply at 7 (citing Franchise Agreements ¶ 16.5).

## IV. CONCLUSION

A preliminary injunction is proper because Rumble has shown that it is likely to prevail on the merits of its trademark, breach-of-contract, and tortious-interference claims, will suffer irreparable harm absent an injunction, and that the balance of harms and public interest favor injunctive relief.

Accordingly, the following is **ORDERED**:

1. Rumble's Motion for Preliminary Injunction (Doc. 4) is **GRANTED in part**.

2. All the defendants are **PRELIMINARILY ENJOINED** in the following manner: Defendants Three South Tampa LLC, One Hillsborough LLC, and Henry Taylor (the Franchisee Defendants), Haley Hunt, and Temper Studios LLC, as well as their officers, agents, servants, employees, and attorneys, and all those in active concert and participation with any of these persons, and entities who receive actual notice of this Order, shall not, for two years from the issuance of this preliminary injunction, own, maintain, engage in, be employed as an officer, director, or principal of, lend money to, extend credit to, lease or sublease space to, or have any interest in or involvement with any business or entity which franchises, licenses, or otherwise grants to others the right to operate such aforementioned businesses at or within ten miles of

the Franchisee Defendants' former Rumble studios or any Rumble studio that was open, under lease, or otherwise under development as of July 25, 2024. All those preliminarily enjoined also shall not, for two years from the issuance of this preliminary injunction, solicit business from customers of the Franchisee Defendants' former Rumble studios or any other Rumble studio, contact any of Rumble's suppliers or vendors for any competitive business purposes, or divulge information in violation of the franchise agreements' noncompete, nonsolicitation, and posttermination provisions. All those preliminarily enjoined also shall not infringe EB Rumble Franchising, LLC's trademarks, trade names, service marks, and related marks.

3. This order shall remain in effect during the pendency of this action, or until further order of the Court.

**ORDERED** in Tampa, Florida, October 30, 2026.

Kathryn Kimball Mizelle
United States District Judge